THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LISE OLSEN, Defendant-Appellant.

First District (2nd Division)    No. 1—97—2928

Opinion filed December 22, 1998.

Cynthia Giacchetti, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Carol L. Gaines, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Defendant Lise Olsen was charged with possession of incendiary devices, manufacturing incendiary devices, transporting incendiary devices, attempted arson, and unlawful use of weapons. A jury initially found her guilty of all the charges and the trial court sentenced her to a four-year prison term for manufacturing incendiary devices only. On appeal, defendant's conviction was reversed and the cause remanded for a new trial. *People v. Olsen*, 273 Ill. App. 3d 1109 (1995) (unpublished order under Supreme Court Rule 23). After a bench trial, defendant was convicted of unlawful use of weapons and sentenced to four years, time considered served. In the instant appeal, defendant contends that the State's evidence was insufficient to support a conviction for unlawful use of weapons and that the statute under which she was charged was unconstitutionally vague as applied to this case. We reverse defendant's conviction.

Chicago police officer Hans Heitman, an arson and explosives investigator, testified that on the morning of July 8, 1992, he received an assignment to go to 5200 North Ravenswood Avenue in Chicago. When he arrived, he saw 21 red and blue plastic containers hanging from both sides of a metal railroad trestle bridge that crossed Foster Avenue. Heitman stated that there was an advertisement for Keim Furs painted on the sides of the bridge and that the furrier was located one-half block west of the bridge.

Heitman testified that after he and other technicians removed the devices from the bridge, he saw that the containers were plastic Skippy peanut butter jars and that each jar contained gasoline and a separate green hobby fuse inserted into the top with a metal plate underneath. Several of the fuses had been lit but had not ignited. Only one of the fuses had ignited and that one device had burned.

Heitman testified that green hobby fuse is used for rocket model experimentation and firecrackers. He explained that the fuse is a cotton thread which is impregnated with a black powder-like substance, burns at a steady rate, and is used as a "timing sort of device." He further testified that after finding that one of the devices had previously burned, he had to assume that the devices were incendiary, meaning they would burn, ignite or explode. Heitman then put on protective clothing, removed the devices from the bridge and conducted X rays of them.

Heitman testified that the jars were approximately one-quarter filled with gasoline, and that the gasoline was poured out and only a small sample was retained by the police for analysis. The jars were also analyzed for fingerprints. Heitman testified that, in his opinion as an explosives technician, he would classify the devices primarily as incendiary. However, depending on the fuel-to-air mixture inside each device, they could also be classified as explosive. Heitman testified that no controlled experiments were conducted on the devices since gasoline is a dangerous substance and it is a well-known fact that gasoline burns.

Detective Robert Schatzel, assigned to the bomb and arson section of the Chicago police department, testified that on November 10, 1992, he received a call from Special Agent Allen Close of the Federal Bureau of Investigation. Close gave Schatzel four names of possible suspects regarding the devices found at the bridge. Schatzel subsequently learned that defendant's fingerprints matched those found on the devices and went to defendant's house the following morning, advised her of her *Miranda* rights and arrested her.

While at the police station, Schatzel again advised defendant of her *Miranda* rights and told her why she had been arrested. According to Detective Schatzel, defendant said that she made the 21 "[M]olotov cocktails" in her apartment without any help. She stated that she painted the containers, filled them with gasoline and then placed wicks in them. On July 3, 1992, she transported 10 of the devices in her car to the scene and hid them near the train trestle. The next day, she took the remaining 11 devices to the same area. She put 11 on the west side of the trestle and 10 on the east side. According to Detective Schatzel, defendant said that she lit the lead device, and as soon as it burst into flames, she left the scene immediately, thinking that all 21 of them fired simultaneously. Defendant told the officer that she did this to "make a demonstration against the cruelty of the killing of animals, for the taking of their furs and nothing else." She chose this particular trestle because she often drove down Foster Avenue when going to and from work and saw an advertisement for Keim Furs on

either side of the trestle which said, "Welcome to fur country, Keim Furs." Defendant also told Schatzel that she had made a banner relating to "freedom of information" that she wanted to hang over the side of the bridge, but she had forgotten to bring it that day. Schatzel acknowledged on cross-examination that although he referred to the devices as Molotov cocktails during his testimony, defendant never used this term and in fact referred to the devices as lanterns.

The parties stipulated that Allen Osoba testified during defendant's first trial that the green hobby fuse used in the devices is also referred to as "green pyrotechnic fuse," is used by "model r[o]cketeers, pyrotechnics and firecracker make[rs]," and that there is "explosive gun powder" in the center of the fuse. Osoba also testified that he tested the gasoline taken from the jars and that 8 of the 20 jars contained over one-quarter ounce of gasoline. Finally, Osoba testified that "gasoline is a mixture of hydrocarbons which is extremely flammable and explosive."

Carl James Dahn, a consulting engineer, testified for the defense that he inspected the items recovered from the trestle and found that each of the containers had a separate green fuse or wick and the items were not wicked together. Each container had a separate white rope, and the ropes were not connected. Each container also had a metal plate suspended below the container by wires. Only one of the devices had burned.

Dahn set up an experiment with materials similar to those found on the trestle. In his first three tests, the hobby fuse went into the container, burned down into the liquid and then extinguished. On the fourth experiment, the hobby fuse burned the gasoline, melted the plastic all the way down into the pan and burned for about four or five minutes until it was out of gasoline. However, Dahn had to alter the design of the device in order to produce such results. Dahn testified that, based on his experimentation, the devices were more like lanterns, not explosives, Molotov cocktails or fire bombs. Dahn explained that a Molotov cocktail is a glass object containing a wick. When the wick is ignited, the object is thrown and gasoline spills over a wide area and catches fire. Dahn also testified that the green hobby fuse used by defendant was not an explosive, but it burns at a slow rate. Dahn testified on cross-examination that gasoline will burn or explode depending on the conditions in which the gasoline and its vapors are mixed. However, according to Dahn, the fuel-to-air ratio would not make the gasoline an explosive substance in these devices.

Defendant testified that in June 1992, she devised a plan to illuminate a banner with "festive lanterns." The banner would be suspended over the original billboard at the Foster Bridge. Defendant

explained that, as an animal rights activist, she believed that the Keim Furs advertisement, "save the environment, wear furs" was fraudulent because the fur industry was harmful to the environment. She intended to hang a banner saying "[f]reedom of information" on the bridge, illuminate it with lanterns, then photograph it and send the photograph to the media.

Defendant explained how she made the devices and testified that she had learned how to make the lanterns when she was a volunteer in Sudan, where there was no electricity. Defendant testified that she purchased the green hobby fuse used in the devices at a hobby store on the recommendation of the clerk at the store after defendant described the lanterns she intended to make. Defendant testified that each container had a separate wick and the wicks were not connected together.

Defendant further testified that prior to bringing the lanterns to the trestle, she tested them three times. Each time she lit the devices, they burned slowly and melted the plastic into the jars. The devices never exploded.

On July 3, 1992, she went to the bridge with 10 empty lanterns and left them in the weeds. The next night, she brought 11 more lanterns, lined the devices on the trestle, put "50cc" of gasoline into each of them, hung them up with metal and then lit each lantern. As she watched, defendant saw that only one of the lanterns had burned according to her design. After the plan failed, defendant took her banner and went home.

Four months later, Officer Schatzel came to defendant's home and asked her if she would come to the police station for questioning. Defendant denied referring to the devices as Molotov cocktails or bombs. She also denied telling Schatzel that the devices were wicked together so that they would "go off" simultaneously and that she lit one, then ran away, hoping they would all ignite. Defendant further testified that she did not create the lanterns and hang them from the bridge with the intent to commit arson, nor did she intend for the devices to operate as bombs.

The trial court found that, based on the testimony of the two explosives experts, Heitman and Dahn, the devices created by defendant were "explosive in nature" and that defendant was guilty of unlawful use of weapons. However, the trial court also found that the evidence was insufficient to establish that defendant was attempting to commit arson on the bridge.

■ Defendant claims that the evidence presented at trial was insufficient to support a conviction for unlawful use of weapons. Where a defendant challenges the sufficiency of the evidence, a reviewing court

must examine the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

■ A person commits the offense of unlawful use of weapons when he or she knowingly manufactures or possesses any "bomb, bombshell, grenade, bottle or other container containing an explosive substance of over one-quarter ounce for like purposes, such as, but not limited to, black powder bombs and Molotov cocktails or artillery projectiles." 720 ILCS 5/24—1(a)(7) (West 1992). Defendant contends, and we agree, that the State failed to prove that the gasoline as contained in the devices was an "explosive substance" and that the devices were "primarily designed to detonate."

The Illinois Supreme Court in *People v. Greene*, 96 Ill. 2d 334, 450 N.E.2d 329 (1983), interpreted section 24—1(a)(7) and held that the statute clearly refers to "explosive devices" and that "the examples of 'black powder bombs,' [M]olotov cocktails, and artillery projectile used in the statute by way of illustration are added indications that the devices intended to be prohibited by this provision of the statute are those containing explosive material which will scatter particles or fire when detonated." *Greene*, 96 Ill. 2d at 338. Moreover, the *Greene* court noted that the kind of explosive devices prohibited are those designed to cause unlawful destruction or injury when detonated. 96 Ill. 2d at 339.

■ In the instant case, the State failed to prove that the devices defendant hung on the trestle were either bombs, bombshells, or grenades or that the devices were of like kind and character to those enumerated in the statute and contained explosive material that would scatter or fire when detonated. Although the State was required to prove the explosive capacity of the devices, it presented no such evidence at trial.

It is undisputed that the devices defendant placed on the trestle did not explode. The one device that lit simply burned. Even the State's own explosive expert, Heitman, did not testify that these devices were explosive devices. Heitman testified that, depending on the fuel-to-air mixture inside each device, it could be an explosive device. However, Heitman never actually tested the gasoline in the peanut butter jars to determine whether their fuel-to-air ratio rendered the gasoline in the devices explosive. In fact, Heitman classified these devices primarily as incendiary devices.

Dahn, the defense explosive expert, did test devices similar to those made by defendant and his tests revealed that these devices

were not capable of exploding. Dahn testified that the devices tested did not explode, but during one experiment in which he altered the devices, they burned and melted. While Dahn testified that gasoline can explode under certain circumstances, he stated that the fuel-to-air ratio in the devices created by defendant would not make the gasoline an explosive substance.

Defendant testified that it was not her intent that the devices explode, but that they operate as lanterns. Defendant testified that she performed three tests on the devices prior to bringing them to the trestle and in each experiment, the devices burned like a candle or lantern and never exploded.

The trial court found defendant to have violated section 24—1(a)(7) simply because these devices were "explosive in nature." To find these devices explosives merely because they contained gasoline would mean that anyone who runs out of gas and must walk from the gas station to his or her car with a container of gasoline, or anyone who uses an alcohol lamp while at home or on a camping trip, runs the risk of violating the statute. However, the devices created by defendant, like the container of gasoline and the alcohol lamp in our above examples, clearly do not fit into the categories enumerated in the statute nor are they of like kind and character to those enumerated.

There is no evidence that the gasoline in the devices defendant hung on the trestle was capable of exploding or that the devices were designed to cause unlawful destruction or injury when detonated. Rather, the State's own expert testified that the devices were primarily incendiary devices. See *Pekin v. Shindledecker*, 99 Ill. App. 3d 571, 426 N.E.2d 13 (1981) (in determining whether a device falls under the unlawful weapon statute, courts should consider the character of the device and its potential for harm, while not being oblivious to the article's everyday use, the circumstances of its discovery, and, in certain cases, the person's explanation as to its presence or possession). Thus, the State has failed to prove defendant guilty of unlawful use of weapons and we reverse defendant's conviction.

Reversed.

GORDON, P.J., and RAKOWSKI, J., concur.